# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STEVEN LUCAS, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-10-206-M |
| | ) |
| LIBERTY LIFE ASSURANCE | ) |
| COMPANY OF BOSTON, | ) |
| a foreign insurance company, | ) |
| | ) |
| Defendant. | ) |

## ORDER

In this action, plaintiff Steven Lucas has alleged that defendant Liberty Life Assurance Company of Boston violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., because it wrongfully denied him long term disability ("LTD") benefits offered by his previous employer, The Coca Cola Company, and administered by defendant. This matter now comes before the Court on the parties' briefs and authorities submitted in support of their respective positions. The chief issue here is whether defendant's decision to deny plaintiff LTD benefits was arbitrary and capricious. Based upon the administrative record,[1] the Court makes its determination.

## I.    BACKGROUND

### A.    The LTD Plan

The Court begins by reviewing the controlling LTD plan terms. Plaintiff participated in the LTD plan offered by The Coca Cola Company, which was funded by an insurance policy

---

[1] "[T]he court must consider only the record before the plan administrator at the time it reached its decision. [Courts should not consider or rely] upon *evidence* not part of the administrative record. [Nor should courts] consider *arguments* that do not appear in the administrative record." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992) (emphasis in original). Accordingly, the Court will not consider the affidavit of Liberty employee Heather Heins because it is not part of the administrative record.

underwritten by defendant. R. at 1-38.[2] Defendant administered the LTD plan and had discretionary authority to construe policy terms and determine eligibility for benefits. R. at 33.[3]

In pertinent part, the LTD plan provides that for participants to be considered "disabled" and entitled to benefits from the LTD plan under the 24-month "Own Occupation" benefit, the participant must be "unable to perform the Material and Substantial Duties of his Own Occupation." R. at 6. To continue to receive benefits after the 24-month "Own Occupation" period, the participant must be "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." *Id.* Specifically, the LTD plan provides that "Material and Substantial Duties" "means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." R. at 7. The LTD plan goes on to define "Any Occupation" to include "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." R. at 5. The chief issue here is whether plaintiff is able "to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." The LTD plan provides that, if an eligible insured becomes disabled at an age less than 60, and remains disabled, benefits will be paid to age 65. R. at 4. If disabled, plaintiff was to receive 70% of his basic monthly earnings. R. at 4.

B. Procedural and Medical History

---

[2] The Administrative Record is cited as "R." followed by the page number.

[3] The LTD plan states: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." R. at 33.

Beginning in 1991, plaintiff was employed in account management with The Coca Cola Company, where he eventually rose to the post of Senior National Account Executive. R. at 3299, 3304. His salary was $10,550.86 per month, and his employment required at least 50% travel. R. at 3263-64, 3299. Specifically, he was involved in refreshment drink sales and other promotions with Sonic Drive-In. R. at 3304. On or about October 19, 2004, plaintiff sustained neck injuries while working a booth at a trade show convention. R. at 3040, 3061, 3101-05 and 3304. Plaintiff sought initial care from his family physician, Dr. Wendell Richards, and then was referred to Dr. Robert L. Remondino, M.D., neurosurgeon, for new cervical disc problems. R. at 231. On January 28, 2005, more than four months after the injury, plaintiff had cervical spine fusion surgery and ceased working while receiving short-term disability benefits. R. at 93, 3304. On June 6, 2005, plaintiff applied for LTD benefits. R. at 87, 3304. On June 30, 2005, Dr. Remondino observed that plaintiff had reached maximum neurological improvement and released plaintiff both from his care and to work with a 20-pound weight restriction. R. at 2924-25. Dr. Remondino also found no "absolute medical contraindication" why plaintiff could not drive for 16 hours a week with overnight stays related to his job activities. R. at 2925. On July 5, 2005, however, plaintiff returned to work. R. at 87, 3304. On July 7, 2005, therefore, defendant advised plaintiff that he was ineligible for benefits from the LTD plan because he had resumed his occupation. R. at 3288.

Plaintiff was seen by Dr. Gary Lee, a board certified independent medical examiner, on July 15, 2005. R. at 3101-05. Dr. Lee provided the opinion that plaintiff "could not perform the driving duties required for his present position," is restricted from lifting greater than 15 pounds and performing any repetitive motion activities with the upper extremities, and permanently restricted from performing any overhead work. *Id.*

On August 9, 2005, plaintiff reported to defendant that he had again stopped working as of August 4, 2005, and defendant began processing plaintiff's claim for benefits under the LTD plan. R. at 85-87. After requesting and receiving plaintiff's medical records, defendant obtained a medical record review from a board-certified neurosurgeon, David Carr, D.O. R. at 3058-76. On September 6, 2005, Dr. Carr observed that plaintiff's restrictions were due to the loss of cervical spine motion and concluded there should be no restrictions relative to lifting, traveling or driving as long as appropriate safety precautions are provided. R. at 3075. On September 21, 2005, defendant initially denied plaintiff's claim for LTD benefits because plaintiff was able to perform his "own" occupation in the national economy. R. at 3039-44. Plaintiff then appealed the denial, and subsequently on October 12, 2005, defendant advised plaintiff that his claim for LTD benefits was "inconclusive to render a final determination." R. at 3031, 3037. Under "Reservation of Rights," defendant advised plaintiff that LTD benefits would issue to "prevent undue financial hardship." *Id*.

While the LTD benefits issued to plaintiff on an interim basis, consulting physician Nathan D. Prahlow, M.D. performed a medical review of plaintiff's file. R. at 2662-65. Dr. Prahlow concluded that it was reasonable for plaintiff to have work restrictions from light to sedentary levels of duty, but that the extent of driving required in plaintiff's position at The Coca Cola Company is problematic. *Id*. Accordingly, on April 20, 2006, defendant advised plaintiff that his claim for LTD benefits had been approved under the "own" occupation standard, and that this standard would change to the "any" occupation standard after 24 months. R. at 2661. Subsequently, on January 18, 2007, defendant confirmed that plaintiff's claim for LTD benefits had been removed from the reservation of rights status and approved based upon the "own" occupation standard. R. at 2508. Once again, plaintiff was advised that his LTD benefit definition would change to "any" occupation

4

after 24 months of benefits have been paid. *Id.*

On February 2, 2006, the Workers' Compensation Court of the State of Oklahoma held that, as a result of plaintiff's accidental injury, he "sustained 3 percent permanent partial disability to the LOW BACK and 25 percent permanent partial disability to the NECK over and above pre-existing 15%..." and awarded plaintiff workers compensation benefits. R. at 2682. Defendant offset the LTD benefits against this award. R. at 62.

On February 8, 2006, Margaret Kelsay, a rehabilitation counselor, performed a vocational assessment and medical needs assessment of plaintiff. R. at 915-31. She advised that plaintiff is unable to function competitively in an employment capacity given his level of pain, frequent headaches, and side effects of his narcotic medication. R. at 924. She averred "[t]his is not a profile consistent with an individual able to participate in competitive employment and it is this counselor's opinion that [plaintiff] is permanently and totally disabled from a vocational standpoint." *Id*.

Furthermore, plaintiff filed for social security benefits and was determined to be disabled under their rules as of August 3, 2005. R. at 2510. Beginning February 2006, plaintiff received a monthly social security benefit in the amount of $2,116.00. *Id*. Plaintiff was also awarded $14,283.00 for social security benefits in arrears. *Id*. Due to overpayment, defendant collected the vast majority of plaintiff's back benefits from social security, and also deducted his monthly LTD benefits by $2,116.00. R. at 2512.

At various points in time between October 2005 and September 2006, defendant conducted secret surveillance where plaintiff was observed performing a number of activities. R. at 2733-44, 2667-74, and 2634-40. Plaintiff "was observed as he exited the vehicle, walked to the rear of the vehicle, lowered the tailgate, pulled three trash cans to the rear of the vehicle, climbed onto the truck

5

bed, bent fully at the waist, and dead-lifted the trash cans-- one at a time-- onto the back of the vehicle... Subject #3 was observed assisting [plaintiff] with one trash can." R. at 2738. Plaintiff was also observed driving a Nissan truck, climbing up and down steps without holding onto the railing, walking at a generally normal pace, standing, frequenting the post office, jumping off the truck bed, cleaning his car, carrying large items and pumping gas. R. at 2733-44, 2667-74, 2634-40 and surveillance video submitted as part of the administrative record.

Defendant's consulting physician, Gale Brown, M.D., reviewed plaintiff's medical records and issued a report on April 23, 2007. R. at 2445-51. Dr. Brown concluded that plaintiff "has permanent partial physical impairment related to his cervical spine condition" supporting specific physical restrictions/limitations. R. at 2446. Although Dr. Brown determined that plaintiff could perform at least sedentary work and "remains *physically* capable of full-time work," she suggested the physical restrictions/limitations of: no overhead lifting or working, occasional driving, occasional lifting/carrying of 10 pounds and an ergonomic work station. R. at 2446-47 (emphasis in original).

In conducting her review, Dr. Brown discussed the relevant issues with Dr. Richards and Bruce Mackey, plaintiff's treating pain management physician. R at 232, 2366, 2439. Dr. Richards appears to have confirmed that plaintiff may be capable of sedentary work, though his capacity for full-time work was uncertain. R. at 2439. Dr. Mackey, who treated plaintiff since 2005 with multiple medications for chronic pain management, stated that he believed plaintiff was totally and permanently disabled due to his inability to drive a vehicle, cognitive changes from pain and medications, and the inability to sit or stand for more than a few minutes at a time. R. at 232, 2366. On May 2, 2007, Dr. Brown recommended that plaintiff undergo an independent medical

6

examination which defendant then requested. R. at 60.

The independent medical examination was conducted on June 12, 2007, by Shawn Smith, M.D., a board certified physical medicine and rehabilitation physician. R. at 227-48. Dr. Smith concluded that plaintiff was without any significant cognitive impairment, although he exhibits some decrease in short-term memory, variable in nature, which has a side-effect related to the types of medication he was taking for pain. R. at 242. Dr. Smith opined that plaintiff's pain behavior appeared to be appropriate, consistent with cervical and lumbar injuries. *Id*. Plaintiff continued to show signs of limitation of cervical motion and pain consistent with a four-level cervical fusion and symptomatic pain. *Id*. Dr. Smith observed that plaintiff's appropriate physical restrictions would be: an occasional 20-pound restriction and a frequent 10-pound restriction for lifting, carrying, pushing and pulling; only occasional and repetitive bending or stooping or reaching above shoulder level, and no overhead activity; the ability to change positions when sitting every 30-40 minutes; and walking and standing restricted to a 1-2 hour frequent basis. R. at 244. Dr. Smith stated that plaintiff had sedentary light duty capacity, but should not operate heavy machinery or engage in routine unsupervised driving due to his medication regimen. R. at 247-48.

Defendant then requested a peer review on plaintiff's medication regimen and cognitive effects from clinical neuropsychologist Dr. Howard Oakes, Psy.D. R. at 2294-95. In his June 25, 2007 report, he stated that he finds no documentation to support the presence of either cognitive and/or psychiatric impairment. R. at 2294. He also observes there is no documentation in the treatment record that the medication reduced plaintiff's cognitive functioning. *Id*. "As such, the mere prescription of pain medication cannot be taken to necessarily equate with the presence of cognitive impairment to a degree to preclude any work activity." R. at 2294-95. Dr. Oakes

7

suggested that a cognitive assessment of plaintiff during medication use would provide a clearer picture and define any impairment and resulting restrictions and limitations. R. at 2295.

Accordingly, on June 26, 2007, defendant then requested an independent neuropsychological evaluation of plaintiff, which was conducted over three days, July 31, August 6 and August 13, 2007 by clinical neuropsychologist Mickey Ozolins, Ph.D. On August 16, 2007, Dr. Ozolins issued his evaluation which found an Axis I DSM-IV of malingering and an Axis II of dependent personality disorder. R. At 2064. Dr. Ozolins averred there was little behavioral evidence of significant pain and "[t]hroughout the evaluation, there was clear evidence of symptom exaggeration and feigning that was consistent with that seen in malingering." R. at 2064.

During the interim, plaintiff was evaluated by internal medicine physician Dr. Sidney Williams on July 5, 2007. R. at 2144-45. His report states that plaintiff is unable to: sit or stand longer than 15 to 20 minutes, sit for two hours during an eight hour workday, or perform gainful employment activities due to the severity of the pain. R. at 2145. Dr. Williams also averred that "[i]t is repugnant to common sense to imply that somehow [plaintiff] 'faked' his way through a social security disability examination and then 'faked' his way into the care of Oklahoma's top Pain Management Specialist." R. at 1177. Defendant retained Dr. Thomas Lazoff, a board certified physical medicine and rehabilitation and pain medicine physician, to conduct an independent medical review regarding plaintiff's disability. R. at 2162-79. After noting the absence of abnormal neurological exam findings by Drs. Richards and Smith, along with notations that plaintiff has denied impairment with medications, and was not cognitively impaired by his medications, his July 9, 2007 report concluded that plaintiff "does have evidence of impairment on the basis of his multilevel cervical fusion" which "resulted in residual impairment in relation to motion of the

8

cervical spine." R. at 2174-75. Dr. Lazoff stated that plaintiff was capable of a light duty position with "restrictions that consistent with the light strength level, including that of no lifting or carrying in excess of 20 pounds occasionally or 10 pounds frequently," on a full-time basis. R. at 2178. Dr. Lazoff contacted Dr. Mackey to discuss these issues, and Dr. Mackey responded that he read some of the notes from the surveillance report but was disgusted and did not watch the surveillance video. R. at 2184. In his previous report dated June 25, 2007, Dr. Mackey observed with regard to the surveillance video that, "I do not approve of this being done." R. at 2308. Dr. Mackey also stated that plaintiff was completely disabled and unable to sit or stand for more than 2 hours in an 8-hour day. R. at 2309.

On August 21, 2007, defendant advised plaintiff that he was nearing the twenty fourth month for receipt of LTD benefits and that it was gathering information to determine whether plaintiff remained eligible for LTD benefits under the "any" occupation standard. R. at 2141. Defendant further advised that it would continue payment of the LTD benefits beyond August 30, 2007, under the reservation of rights until a decision was rendered. *Id.* Defendant then began the process of obtaining updated information from plaintiff's medical providers, including from Dr. Mackey. R. at 61, 2499. On both October 19, 2004 and December 27, 2007, Dr. Mackey concluded that plaintiff is totally and permanently disabled due to his cervical disorder. R. at 1972, 1980. Various office notes of Dr. Mackey from October 2006 to February 2007 indicate that plaintiff was capable of traveling across states to Alabama, working in his yard, operating a tractor and home-schooling his 16 year old daughter. R. at 2463, 2466, 2468, and 2471.

On September 4, 2007, Teresa Marques, a vocational consultant performed a transferable skills analysis. R. at 2101-05. Based upon the information presented, Ms. Marques concluded that

9

plaintiff had transferrable skills and identified the positions of Inside Sales Representative, Purchasing Agent and Sales Service Supervisor as appropriate for plaintiff. R. at 2104.

Defendant requested another independent file review which was conducted by Richard Kaplan, M.D., a board certified physical medicine and rehabilitation physician. R. at 2087-94. Dr. Kaplan's September 14, 2007 report observes that plaintiff's cervical spine impairment was minimal, and plaintiff was capable of performing light work on a full-time basis, lifting up to 20 pounds frequently, but restricted from postural activities such as bending, twisting, climbing and kneeling. R. at 2091, 2093.

On September 18, 2007, defendant advised plaintiff that his LTD benefits would be terminated effective September 21, 2007 because the records and information received reflected that plaintiff was capable of performing full-time work and a vocational analysis identified occupations which plaintiff could perform. R. at 93, 1197, 2073-86. Plaintiff appealed the decision to terminate his LTD benefits. R. at 1197-1207.

Defendant then requested that Jack Denver, M.D., board certified in physical medicine and rehabilitation and in pain medicine, conduct another independent peer review of plaintiff's file. R. at 558-76. Dr. Denver's April 15, 2008 report finds that plaintiff has functional impairments including a cervical multilevel degenerative disc disease, and status post cervical discectomy and fusion. R. at 572. Further, Dr. Denver observed that plaintiff's restrictions and limitations were: unrestricted sitting, standing and walking; lifting, carrying, pushing and pulling up to 20 pounds occasionally or 10 pounds frequently; bending, stooping, squatting and kneeling frequently; no sustained overhead activities; and no climbing and balancing. R. at 572-73. Dr. Denver also reported that the available medical evidence does not support cognitive deficits due to plaintiff's

pain or pain medication. R. at 573. Dr. Denver concluded that "[b]ased on [a] review of physician documentation, neuropsychological findings, and review of video surveillance, [plaintiff] was able to perform sustained full-time work within the restrictions and limitations described above." R. at 575.

Defendant then requested an updated Transferrable Skills Analysis and Labor Market Survey Update, which was conducted by Senior Vocational Case Manager Catherine Chandick. R. at 577-79. Based upon the restrictions and limitations provided by Dr. Denver, Ms. Chandick identified two additional occupations for which plaintiff was qualified: Account Executive and Outside Sales Rep. R. at 577. On June 19, 2008, defendant advised plaintiff that his appeal of the termination of benefits was being denied because plaintiff did "not meet the definition of disability as defined in [the LTD plan]." R. at 93, 554, 577.

Beginning the fall of 2008, plaintiff re-entered the workforce on a part-time basis teaching classes at Freed-Hardeman University. R. at 199. While the total time requirement for the job was approximately 16 hours per week, plaintiff was expected to be in his office for 10 hours per week. *Id*. He resigned on April 22, 2009, with an effective date of April 30, 2009. R. at 127. The President of Freed-Hardeman University observed that plaintiff "struggled to perform his duties" and required accommodations. *Id.* "In the end, however, his physical limitations prevented him from being able to carry out his desire to serve." *Id*.

On October 20, 2008, plaintiff commenced an action against defendant to recover LTD benefits.[4] After the parties filed their opening briefs, it was determined that Dr. Shawn Smith's

---

[4] *Steven F. Lucas v. Liberty Life Assurance Co. of Boston*, Case No. CIV-08-919-M, in the United States District Court for the Western District of Oklahoma.

independent medical examination report contained in the administrative record was not the final version of the report. Because the final report had not been considered in the appeal process, on October 16, 2009, the court dismissed the action, stating that "because Liberty Life is reopening Plaintiff's claim, this action is no longer ripe because the administrative record is not finalized." *See* docket no. 24, Case No. CIV-08-919-M.

On November 10, 2009, defendant advised plaintiff that his appeal for LTD benefits was being reopened. R. at 224. On November 11, 2009, defendant requested another independent review by Milton Klein, D.O., a physical medicine and rehabilitation and pain management physician. R. at 222. On December 8, 2009, Dr. Klein reported that plaintiff was able to perform sedentary to medium duty work activities, and neither plaintiff's pain nor his prescribed pain medications cause any superimposed cognitive impairment. R. at 213. Dr. Klein also indicated he made four attempts over three days to contact Dr. Mackey, plaintiff's treating physician, and left messages but Dr. Mackey was always unavailable. R. at 210.

On January 5, 2010, defendant sent Dr. Klein's report to Dr. Mackey for review and comment. R. at 191. On January 12, 2010, plaintiff submitted additional medical records from Dr. Mackey's office to defendant. R. at 134-90. On January 20, 2010, Dr. Mackey opined that plaintiff "continues to be totally and permanently disabled and unable to find work on a full-time basis." R. at 131. He also stated that plaintiff was unable to work on a full-time basis due to chronic pain and medications. *Id*. Defendant then forwarded Dr. Mackey's updated records to Dr. Klein for another independent medical review. R. at 122-125. Dr. Klein determined, based on his review of Dr. Mackey's updated records, that plaintiff has no dysfunction and was able to perform sustained full-time work without any supported restrictions and limitations. R. at 124-25. Dr. Klein made

12

numerous attempts to discuss plaintiff's condition with Dr. Mackey, but Dr. Mackey did not return his calls. R. at 122.

On February 15, 2010, defendant upheld the original decision to deny benefits upon completing its review of plaintiff's claim. R. at 95. Defendant concluded that plaintiff's medical condition did not prevent him from performing alternative occupations. R. at 100. The decision was based on the vocational analysis, independent medical reviews and examinations, records from plaintiff's physician, plaintiff's employment history and the final version of Dr. Smith's report. R. at 95-100. Thereafter, on March 2, 2010, plaintiff commenced this action against defendant to recover LTD benefits.

II.     STANDARD OF REVIEW

In *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), the Supreme Court set out the appropriate standard of review for cases contesting a benefit determination under an ERISA plan. Generally, "[p]rinciples of trust law require court to review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Id*. at 111 (citation and quotation omitted). However, where the benefit plan gives the administrator or fiduciary authority to determine the eligibility for benefits, or construe the terms of a policy, courts are to review decisions of a plan administrator and/or insurer under an arbitrary and capricious standard. *Id*., *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004) (overturned on other grounds).[5]

Under the arbitrary and capricious standard, "review is limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith." *Hickman v. GEM Ins.*

---

[5] Also in *Fought*, 379 F.3d at 1003 n. 2, the Tenth Circuit noted that it "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context."

*Co.*, 299 F.3d 1208, 1213 (10th Cir. 2002). Therefore, the Court "will uphold an administrator's decision unless it is not grounded on *any* reasonable bases." *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (internal citations and quotations omitted) (emphasis in original).

> When reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary and capricious." The decision will be upheld unless it is "not grounded on *any* reasonable basis." The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness-even if on the low end."

*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (internal citations omitted). "Certain indicia of an arbitrary and capricious denial of benefits include 'lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.'" *Graham*, 589 F.3d at 1358 (internal citation omitted). Here, plaintiff points to defendant's conflict of interest as support for overturning defendant's denial of benefits. Inherently, he also argues there was a lack of substantial evidence supporting the denial of his LTD claim.

The *Graham* court defined "substantial evidence" as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance." *Id*. (internal citation and quotation marks omitted).

Defendant's dual role as "both insurer and administrator of the plan" creates "an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound." *Id*. (internal citation and quotation marks omitted). In *Glenn*, the Supreme Court explained how a court should review factors where a defendant has an inherent conflict of interest:

14

> We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one....
>
> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117 (internal citation omitted). The Tenth Circuit has also identified steps such as using independent physicians, instead of on-site physicians, to review medical records and examine a claimant, and the diligence of the claim administrator in investing the claim. *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009).

## III. DISCUSSION

As noted above, the Court evaluates defendant's decision under the arbitrary and capricious standard, taking into account its conflict of interest as both administrator and insurer for the LTD plan. Plaintiff contends that defendant's conflict is far more than minimal in that its decision to deny plaintiff LTD benefits saved it over $1 million. Defendant counters that it requested five independent physician reviews, two independent medical examinations, and the employees who considered plaintiff's claims and appeals are not compensated or evaluated based on the number or amount of claims paid or denied. Furthermore, defendant cites that affirmative steps have been

undertaken to separate its underwriting and claims functions to further accuracy in its claims processes. The Court concludes that defendant's conflict of interest does not weigh heavily as a factor in the analysis in this case, as there is no particular or identified evidence suggesting a "higher likelihood that it affected [defendant's] benefits decision." *Id*. Further, the record indicates defendant took "active steps to reduce potential bias and promote accuracy." *Id*. Specifically, after recognizing this to be a close case following multiple levels of internal review, defendant arranged for several examinations to be conducted by several independent physicians.[6] Accordingly, the Court adjusts the level of deference given to defendant's decision.

As noted previously, plaintiff essentially argues that defendant's decision was not supported by substantial evidence. Plaintiff's arguments to a large extent focus on the various health conditions suffered as a result of his October 2004 injury. It is clear that plaintiff suffered severe injuries resulting in ongoing cognitive and physical impairments, and to an extent, chronic pain. Nevertheless, plaintiff's entitlement to benefits under the LTD plan is not controlled by the general severity of his injuries, but by the definitions and other provisions of the plan. Those definitions and other provisions determine whether he is "disabled" within the meaning of the plan. The determinative issue here is whether there is a reasonable basis, supported by substantial evidence, for defendant's determination that plaintiff could work in some capacity based on his impairment.

The record demonstrates that defendant undertook extensive measures to investigate whether plaintiff, after having received twenty-four (24) months of payments, was able to perform the duties

---

[6] That plaintiff's claim was initially denied and defendant took the above-referenced steps to reduce potential bias during plaintiff's appeal serves to reduce, but does not eliminate, the mitigating effect on defendant's conflict of interest. The question ultimately at issue here is whether defendant's final decision was reasonably and sufficiently supported.

16

of any gainful occupation for which he was reasonably fitted by education, training or experience. Defendant not only repeatedly requested and reviewed the medical records from plaintiff's healthcare providers, but also sought independent reviews of those records and examinations of plaintiff himself by independent physicians.

Plaintiff has nevertheless argued that defendant's denial of LTD benefits was arbitrary and capricious. To a large extent, plaintiff's arguments focus on the multiple and differing opinions of the medical professionals who examined plaintiff and/or reviewed his records. For instance, plaintiff argues that Drs. Mackey, Richards and Williams have all concluded that plaintiff is permanently disabled and incapable of employment and Dr. Smith concluded that plaintiff should not engage in routine, unsupervised driving. Other physicians including Dr. Lazoff did not address any restrictions regarding plaintiff's ability to drive. According to plaintiff, the driving restriction alone would preclude him from availing himself of any of the occupations identified by the vocational specialists. However, no less than five independent physicians, Drs. Carr, Lazoff, Kaplan, Denver and Klein, observed that plaintiff had at least a sedentary full-time work capacity based on their review of medical records. Two independent physicians (Drs. Smith and Ozolins) who examined plaintiff also recognized plaintiff's work capacity, and Dr. Ozolins found evidence of symptom exaggeration and malingering. Even plaintiff's neurosurgeon, Dr. Remondino, released him to work. As such, the Court finds that the conclusions of these physicians have support in the record.

While plaintiff contends that defendant focused almost solely on the favorable opinions of its own physicians, and ignored the unfavorable opinions of plaintiff's treating physicians, the Tenth Circuit has observed that an administrator's decision to deny claims for benefits based on a lack of medical necessity is not arbitrary and capricious even when the decision is based on impartial

17

medical reviews, and even if the evidence conflicts on the disability. *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir. 1999), *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999). Therefore, the Court finds it is permissible for defendant to base its decision on the opinions of independent reviewing physicians and independent examining physicians who stated the opinion that plaintiff had work capacity, even if such opinions contradict with opinions of plaintiff's treating physicians.

Dr. Mackey concluded that plaintiff is permanently disabled and incapable of employment. The evidence, however, demonstrates that Dr. Mackey often did not respond to calls of other physicians in reference to independent reviews of plaintiff's matter, and he found distasteful that defendant would pursue a surveillance video of plaintiff. The Court further finds that Dr. Mackey's office notes contain indicia of plaintiff's ability to drive, travel long distances, perform yard work and drive a tractor. Whereas plaintiff contends that one of the vocational reports relied upon by defendant failed to address in any way, the physical and travel requirements of the identified jobs, the Court finds plaintiff's ability to drive is glaringly apparent from observation of the surveillance video. Plaintiff minimizes the amount of activity captured on the surveillance video, and also argues that nothing in these scant videos even remotely show plaintiff doing anything to indicate he is able to engage in employment. The Court, however, disagrees. Having observed the above-referenced activities on the surveillance video, the Court finds that plaintiff's abilities, rather than his limitations and restrictions, are readily apparent in the video.

Regardless, the Court finds that defendant has identified the alternative occupations of Inside Sales Representative, Purchasing Agent, Sales Service Supervisor, Account Executive and Outside Sales Representative, all of which have reasonable and/or comparable salary ranges to plaintiff's

former position. Furthermore, all of these positions appear to allow plaintiff the opportunity to sit, stand or change positions as needed throughout the day within his identified restrictions and limitations.

Plaintiff next argues that the Social Security Administration immediately agreed that plaintiff was incapable of working and did not require an administrative hearing. Plaintiff asserts it is entirely inconsistent for defendant to argue that plaintiff was not disabled and could engage in employment, and that defendant has failed to reconcile its own conclusion that plaintiff can work in other jobs while the Social Security Administration concluded that he cannot. The record is clear that defendant considered the Social Security Administration's decision to grant plaintiff benefits under that federal statute, and determined that "the decision by the Social Security Administration does not determine entitlement to benefits under the terms and conditions of The Coca-Cola Company Group Disability Income Policy." R. at 101. The Court finds that defendant certainly did not ignore the decision by the Social Security Administration.

In denying LTD benefits to plaintiff, defendant substantially relies in part on plaintiff's brief tenure at Freed-Hardeman University. Plaintiff asserts that his professorship was a part-time position because he only worked 16 hours a week. However, the Contract of Faculty Employment indicates that he was employed "full-time as Instructor in Management." R. at 254. Eight months after he started his work as a professor, plaintiff alleges he resigned because his disability prevented him from performing his duties. While the record shows that plaintiff was offered many accommodations to perform his job as professor, the Court finds there is conflicting evidence as to whether plaintiff resigned his employment due to his disability. Specifically, the Court finds there is evidence that the university contemporaneously instituted a layoff and 18 persons including 3

19

faculty members lost their jobs. R. at 260. This points to the reasonable conclusion that plaintiff's position was ended by the university and not by plaintiff himself.

In the final analysis, defendant's "decision will be upheld so long as it is predicated on a reasoned basis. In fact, there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Anderson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). Given how the evidentiary support for plaintiff's claim developed, the Court concludes that defendant's denial of coverage was not arbitrary and capricious. Its determination that plaintiff was not eligible for LTD benefits was supported by substantial evidence, and was a reasoned application of the terms of the policy to this case, untainted by the slight deference accorded to plaintiff based on the conflict of interest. Accordingly, judgment will be entered in favor of defendant and against plaintiff.

**IT IS SO ORDERED this 7th day of February, 2011.**

*[Signature]*
VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE